1  Gale R. Gustafson
2  Daniel T. Jones
   Fernando J. Terrones
3  GUSTAFSON LAW OFFICES
4  400 South Main Street, Suite 101
   Conrad, Montana 59425
5  Telephone: (406) 278-7521
6  Facsimile: (406) 278-7522
7  gustafsn@3rivers.net
   djones@glo.law
8  fterrones@glo.law
9
   Ross T. Johnson
10 KOVACICH SNIPES JOHNSON, P.C.
11 P.O. Box 2325
   Great Falls, MT 59403
12 Telephone: (406) 761-5595
13 Facsimile: (406) 761-5805
14 ross@mttriallawyers.com
   *Counsel for Plaintiff*
15

**FILED FEB 28 2020**

SHIRLEY E. FAUST, CLERK
By _____ Deputy

16          **MONTANA FOURTH JUDICIAL DISTRICT COURT,**

17                      **MISSOULA COUNTY**

18

19 CODY MARBLE,                          )
            Plaintiff,                    )
20                                        )    CAUSE NO. DV-19-14
                                          )    SECOND AMENDED
21     vs.                                )    COMPLAINT &
                                          )    JURY DEMAND
22 MISSOULA COUNTY, MICHAEL MCMEEKIN,)
23 BRAD GIFFIN, JEREMY MEEDER, MICHAEL)
24 DOMINICK, ROBERT TAYLOR, MISSOULA )
   COUNTY SHERIFF'S OFFICE, FRED VAN )
25 VALKENBURG, JENNIFER CLARK, fka     )
26 JENNIFER JOHNSON, DOROTHY            )
   BROWNLOW, ANDREW PAUL, MISSOULA )
27 COUNTY ATTORNEY'S OFFICE, and JOHN )
28 DOES 1-5,                            )
            Defendants.                  )

1

17

1.      For his Second Amended Complaint against Defendants in their individual and official capacities, and Defendant entities, Plaintiff, Cody Marble, states as follows:

2.      This Court has jurisdiction pursuant to Mont. Code Ann. § 3-5-302.

3.      This is the proper venue pursuant to Mont. Code Ann. §§ 25-2-117 & 126.

## BACKGROUND

***The Setup of Cody Marble***

4.      Marble spent thirteen (13) years in prison for a heinous sex crime conviction that the Missoula County Attorney's Office declared erroneous. He seeks accountability and redress for the misconduct that cost him the prime years of his life.

5.      Marble's wrongful conviction was the result of serious misconduct by each Defendant. They latched on to obviously unreliable statements from C Pod detainees, perpetuated fabricated evidence, hid exculpatory evidence, and otherwise engaged in misconduct to convict an innocent man.

2

6.     On Sunday morning, March 17, 2002, Missoula County Sheriff's Office Deputy Jeremy Meeder and Missoula County Sheriff's Office Sergeant Michael Dominick drove their patrol vehicles with an entourage to the Marble home and arrested Cody Marble, a 17-year old minor, at his residence in Missoula County, Montana, without an arrest warrant and without probable cause.

7.     Marble was taken into custody for a crime that never happened in the presence of his only parent, Jerry Marble [Marble's mother passed away about a year prior to him being unlawfully seized], and was escorted to their patrol vehicle.

8.     Neither Deputy Meeder nor Sergeant Dominick ever asked Jerry Marble to accompany them to the Missoula County Sheriff's Office or informed him that his minor son, Marble, was going to be interrogated without the presence of a parent or legal counsel. Sergeant Dominick advised Jerry Marble that they had audio/video evidence proof that Marble had raped an inmate in the juvenile wing at the Missoula County Detention Center ("MCDC") on March 10, 2002, which was a lie, and that his son was under arrest.

9.     Little did Marble and Jerry Marble know that on March 17, 2002, their lives would change for the worse.

3

10.     During the evening of March 16, 2002, Scott Kruse, a level 1 (most restrictive status) juvenile detainee jailed at the MCDC for accountability for murder of a transient, gave Juvenile Detention Officer Tracy Addyman, of the MCDC, a false report that Marble, a level 3 (least restrictive status) juvenile detainee, had raped Robert Thomas, a level 2 juvenile detainee, both of whom had since been released from MCDC on March 12, 2002.

11.     The focus of the Marble investigation was orientated around the "fabricated story" of juvenile delinquents as first initiated by Kruse even though the details they provided contradicted known facts of the evening of March 10, 2002.

12.     Instead of focusing on the exculpatory evidence of four (4) highly-trained Adult Juvenile Detention Officers on duty on the night at issue, Missoula County Sheriff Michael McMeekin and the Missoula County Sheriff's Office (during Fred Van Valkenburg's tenure as Missoula County Attorney) believed the juvenile detainees' contradictory eyewitness accounts and the conversations with Robert Thomas regarding an alleged rape of Thomas by Marble which said Juvenile Detention Officers stated was impossible to have happened.

4

13.     It was alleged by Kruse that on the evening of March 10, 2002, between 9:00 p.m. and 9:45 p.m. when he was subject to lockdown as a level 3 detainee and at least four (4) other pod mates were gathered in the C Pod common area just outside the shower, Thomas and Marble entered the shower changing area together. It was MCDC policy at the time that the juvenile detainees could only enter the shower area in the mornings between 6:30 a.m. and breakfast which was served at 7:30 a.m., and that only one detainee at a time was released from their cell to shower and another detainee was not released from their cell to shower until the prior detainee had returned to and was locked in their cell.

14.     Kruse further alleged that approximately ten minutes later, Marble and Thomas left the shower area and Thomas went to his cell just prior to the 10:00 p.m. lockdown down for level 2 detainees. Thomas later alleged that during the ten minutes he was in the shower area with Marble, that Marble told him to remove his pants and grab his ankles.  The most restricted and least trusted juvenile detainees were assigned a level 1 and the least restricted and most trusted juvenile detainees were assigned level 3, and level 2 being

5

assigned to those detainees who were in between. Marble and another detainee were the only level 3 juvenile detainees in C Pod.

15.     On March 16, 2002, Sergeant Dominick had Missoula County Sheriff's Office Lieutenant Willis Hintz open the evidence locker and retrieve the C Pod videotape.

16.     Sergeant Dominick attempted to view the videotape along with Juvenile Detention Officer Wendy Nelson. Once he started viewing the videotape, Sergeant Dominick was not able to corroborate the juvenile detainees' rape allegations against Marble for the date of March 10, 2002, because, according to Sergeant Dominick, he lacked familiarity of the juvenile area in the MCDC.

17.     Yet, even though Sergeant Dominick admitted that he was unable to corroborate the witnesses' allegations with the C Pod videotape because he lacked familiarity of the juvenile wing in the MCDC, he nevertheless concluded unjustifiably that the juvenile detainee witnesses corroborated one another.

18.     After declining to familiarize himself with the juvenile wing at the MCDC, Sergeant Dominick placed the C Pod videotape back into the evidence locker location of PL 3.

6

19.    Obviously, Sergeant Dominick could have easily paused the videotape and stepped right on over to the juvenile wing at the MCDC to physically study the layout of C Pod in order to familiarize himself with the alleged scenario, but chose not to do so.

20.    Sometime after placing the C Pod videotape back into the evidence locker, Sergeant Dominick briefed Missoula County Sheriff's Office Captains Greg Hintz and Susan Hintz, also Supervisor of MCDC, about the Marble investigation.

21.    While Sergeant Dominick was briefing the Captains, Missoula County Sheriff's Office Deputy Robert Taylor was briefing Missoula County Deputy Attorney Jennifer Johnson on the specifics of the case against Marble and receiving investigation guidance from her.

22.    While the investigation was in its infancy and ongoing, Missoula County Deputy Attorney Jennifer Johnson was providing investigation advice and performing the role of a peace officer by also investigating the matter with Deputy Taylor while Sergeant Dominick, Deputy Nelson, and Deputy Meeder were investigating and updating her and Deputy Taylor about the result-orientated investigation against Marble.

7

23.     During the evening of March 16, 2002, Missoula County Sheriff's Office Deputy Brad Giffin was advised by dispatch at 9:00 p.m. to respond to the MCDC's juvenile wing in regards to an alleged forcible rape that occurred on March 10, 2002.

24.     Upon arrival, Juvenile Detention Officer Tracy Addyman told Deputy Giffin that Kruse was the first to tell her that a rape happened in the shower area of C Pod. The rape allegation involved Marble and Thomas, both of whom had been released from custody on March 12, 2002.

25.     While at MCDC, Deputy Giffin first interviewed juvenile detainee Nicholas Melton-Roberts, now dead. Melton-Roberts stated to Deputy Giffin that he saw Thomas with his pants down and saw Marble directly behind Thomas for 5 to 10 minutes in the shower changing area. Melton-Roberts previously sought, unsuccessfully, Marble's cooperation in setting up another detainee, William Goodbird, for a sexual assault/physical injury against him prior to his release from MCDC.

26.     Next, Deputy Giffin interviewed juvenile detainee Russell Miller. During the interview, Deputy Giffen kept correcting Miller's allegations in order for them to fit Kruse's false allegation against Marble. For

8

instance, Miller first alleged he saw oral sex performed, which Deputy
Giffin did not like hearing because it did not match Kruse's story of
anal sex, so he corrected Miller until Miller stated what Deputy Giffin
wanted to hear, which was that Miller instead witnessed anal sex.

27.     Next, Deputy Giffin interviewed juvenile detainee Gregory Van
Mueller. Most notably, Van Mueller specifically admitted to Deputy
Giffin that he did not witness anything at all; that he just heard about
it. Despite admitting to Deputy Giffin from the outset that he did not
witness anything, towards the end of the extensive interview, Van
Mueller finally stated that he allegedly witnessed Thomas and Marble
going into the shower area together.

28.     After Van Mueller's interview concluded, Deputy Giffin
interviewed Kruse. He told Deputy Giffin that he was in lockdown as
of 9:00 p.m. during the evening of March 10, 2002, but nevertheless,
went on to state that he saw through the vanity wall [which is not
transparent] in the shower area that Thomas was bent over and his
feet  and hands were on the floor.

29.     Kruse's statements ranged from seeing everything through the
vanity wall of the shower changing area to just assuming it happened

9

all while he was in lockdown in his cell with no view of C Pod and C Pod's shower area.

30.      Kruse was in custody at MCDC for participating in a brutal homicide of a homeless man, and was the first person to contact the MCDC Adult Detention Guard, Tracy Addyman, and make a report against Marble on March 16, 2002. Moreover, during his stint at MCDC, Kruse threatened to slit a guard's throat and hid a long nail in his shoe to be used at a later time against someone.

31.      Missoula County Deputy Attorney Dorothy Brownlow subsequently amended Kruse's accountability homicide charge, a felony, to assault, a misdemeanor, and allowed him to be released in order to keep Kruse's fabricated allegation against Marble away from the court and jury.

32.      Immediately after his release, Kruse fled the jurisdiction. It was later determined in September 2002, prior to trial, that Kruse made up the story that Marble raped Thomas. Several years later, the Missoula County Attorney's Office under Missoula County Attorney Kirsten Pabst's keen stewardship and Missoula County Sheriff's Office (during Pabst's epoch) subsequently determined that Kruse could not have possibly witnessed anything in C Pod on the night of March 10, 2002,

10

because documentation and video established that Kruse, a level 1 detainee, had been subject to lockdown at 9:00 p.m. and therefore confined to his cell with no visibility of the C Pod and the shower changing area. Prior to fleeing the jurisdiction, Kruse recanted his statement against Marble to Missoula County Deputy Attorney Brownlow who did not disclose his recantation until the 11th hour before trial, but instead disregarded it because it did not support her case against Marble.

33.     The last person Deputy Giffin interviewed on March 16, 2002, was juvenile detainee Justin Morin. He stated to Deputy Giffin that he saw Marble-humping Thomas through the vanity wall in the shower area. But then towards the end of the interview, Morin stated he believed Marble raped Thomas because Marble was red when he exited the shower area.

34.     It should be noted that Morin first asserted that Thomas told him about the rape. However, Thomas unequivocally denied telling Morin anything. Yet the prosecution kept Morin away from Marble's trial by attesting they could not locate him even though the prosecution knew of Morin's whereabouts. The prosecution knew Morin was at Aspen Youth Alternatives in Boulder, Montana.

11

35.     After Deputy Giffin concluded his interviews of the juvenile detainees on March 16, 2002, he disregarded the conflicts in their physical descriptions of the alleged rape and verbal exchanges with Thomas following the alleged rape. It should also be noted that Deputy Giffin only interviewed the juvenile detainees once notwithstanding their conflicting statements, and he never interviewed the four (4) highly-trained Adult Juvenile Detention Officers.

***The Failure to Properly Investigate the Conflicting Initial False Allegations***

36.     Disturbingly, the Defendants failed to properly weigh and investigate the weight of the juvenile detainees' conflicting allegations against Marble because they were operating under a preconception of Marble's guilt by conducting a predetermined result-certain orientated investigation against Marble, which was in direct contravention of Marble's presumption of innocence.

37.     Defendants knew the statements provided to them during the March 16, 2002 interviews by the above-mentioned juvenile detainees were fabricated because the statements contradicted one another and the eyewitness accounts were impossible to have

12

occurred, which was also attested to by the four (4) highly-trained Adult Juvenile Detention Officers on duty during the evening of March 10, 2002.

38.     Moreover, MCDC's juvenile wing has a policy of shower use in the early morning only. Juveniles are forbidden from going to the shower area after the morning hours.

39.     Therefore, had any juvenile been in the shower area on the evening of March 10, 2002, contrary to the policies MCDC, the juvenile(s) would have gotten in trouble with the Juvenile Detention Officers then on duty. This is the most glaring hole in the juvenile detainees' stories that was not substantiated at all in the Defendants' result-orientated investigation against Marble.

40.     Moreover, juvenile detainee Timothy Ruthford reported to Missoula County Sheriff's Office Deputy Pat Estill that he saw Thomas perform oral sex on Marble. Yet, at trial he omitted his oral sex statement and testified he believed Marble and Thomas had anal sex.

41.     Deputy Giffin interviewed Miller and Deputy Estill interviewed Ruthford and both juvenile detainees stated they witnessed oral sex.

13

During Deputy Giffin's interview of Miller, he corrected Miller to assert that he saw witnessed anal sex.

42.     Thomas, Kruse, Melton-Roberts, Miller, Van Mueller, Morin, and Ruthford all gave contradictory statements and/or impossible personal eyewitness accounts of the fabricated rape allegations against Marble.

43.     Throughout all of the contradictory statements and eyewitness accounts given by the juvenile detainees to Deputy Giffin on March 16, 2002, he nonetheless embraced the juvenile detainees' conflicting statements and shared his affirmative belief in his report that there were striking similarities in all of the statements he heard. Deputy Giffin also testified at trial that he found it very unusual that the juvenile detainees wanted to talk to him at all. Deputy Giffin also testified at trial that he never watched the videotape of C Pod for the evening of March 10, 2002.

44.     To add insult to injury, Sergeant Dominick briefly viewed the videotape of C Pod on March 10, 2002, the day in question, along with Deputy Nelson. And, after briefly viewing the videotape, Sergeant Dominick gave up trying to corroborate the purported eyewitnesses' false accusations because he lacked familiarity of the

14

juvenile area in the MCDC and unjustifiably concluded the C Pod videotape corroborated the juveniles' stories incriminating Marble when in actuality the videotape proved Marble never committed a sexual assault against Thomas.

45.     Despite all of the juvenile detainees' blatant lies believed by the Defendants, Deputy Taylor initiated on March 16, 2002, a criminal case against Marble with Missoula County Deputy Attorney Jennifer Johnson.

46.     This was Deputy Taylor's chance to put Marble away for good, once and for all. Therefore, Deputy Taylor made sure to supply Thomas with answers he wanted to hear to his questions in order to engineer a "solid" case against Marble. Deputy Taylor still had a grudge and unfinished business against Marble and his father who previously reported him for excessive force against Marble.

47.     The reason why Deputy Taylor wanted to put Marble away for good is because in a previous encounter a few years prior to March 2002, Deputy Taylor spit in Marble's face, shoved Marble, and challenged Marble to a fight when Marble was 14 years old. Ultimately, Deputy Taylor had kicked Marble to the ground and when Deputy Taylor's partner attested to this abuse of Marble by Deputy

15

Taylor after Jerry Marble reported the incident to Missoula County Sheriff's Office Captain Don Mormon, Deputy Taylor was sanctioned. The charges brought against Marble following this encounter were dismissed.

48.    Due to their failure to properly investigate, none of the Defendants learned from the outset of the investigation against Marble that had they interviewed the four (4) highly-trained Adult Juvenile Detention Officers who were on duty during the evening of the fabricated rape story, they would have learned that these Adult Juvenile Detention Officers would have been able to observe the alleged rape if it had occurred and that they would each state that nothing happened that evening at issue.

49.    For instance, Juvenile Detention Officer Susan Johnson Latimer, who was on duty the night of the alleged rape, did not see Marble commit a crime and due to the layout of C Pod and the monitoring methods of MCDC, the Juvenile Detention Officers would have noticed the act and people in the shower area from the control room and while doing their C Pod walkthroughs and cell checks.

50.    Moreover, the MCDC log for March 10, 2002, reveals that the four (4) highly-trained Adult Juvenile Detention Officers were

16

performing random and overlapping walkthroughs and cell checks of C Pod from 8:56 p.m. to 10:25 p.m., the alleged time period of the fabricated crime.

51.     For instance, during the time period of the rape story, the MCDC log reveals that at 8:56 p.m., Marble returned to the C Pod from the recreation area. Then at 9:10 p.m., Juvenile Detention Officer Chris Tenny did random walkthroughs and cell checks of A, D, C, and B Pods. At 9:25 p.m., Juvenile Detention Officer Armstrong did walkthroughs and cell checks of A, D, C, and B Pods. Then at 9:42 p.m., Juvenile Detention Officer Tenny did walkthroughs and cell checks of A, D, C, and B Pods. Then at 9:54 p.m., Juvenile Detention Officer Latimer did walkthroughs and cell checks of A, B, C, and D Pods, and when she walked by the shower area in C Pod she did not observe anyone there. At 10:00 p.m., Juvenile Detention Officer Joanie Bigelow conducted a walk through, pencil pass, and cell check of C Pod.

52.     Out of all of the four (4) highly-trained Adult Juvenile Detention Officers observing C Pod from the Control Room and conducting walkthroughs and cell checks on the evening of March 10, 2002,

17

during the alleged time period of the alleged rape, at least one of them would have observed activity in the shower area of C Pod.

53.     Despite the importance of the videotape of C Pod during the evening of when the alleged rape was to have occurred, Defendants refrained from reviewing the videotape of C Pod and interviewing the four (4) highly-trained Adult Juvenile Detention Officers who worked the late evening of March 10, 2002.

54.     Collectively, Defendants never made any effort to scrutinize the contradictory allegations of the juvenile detainee conspirators, the physical evidence MCDC had recorded and logged, and the written statements of the four (4) highly-trained Adult Juvenile Detention Officers given to Scott Newman, Juvenile Unit Manager at MCDC.

55.     Additionally, during a morning briefing sometime in 2002, former Missoula County Sheriff's Office Deputy Douglas Hartsell heard Deputies Dominick and Taylor specifically talk out loud about making Marble's and Jerry Marble's lives hell.

56.     Consequently, Missoula County is liable for all of the Defendants' acts or omissions in their investigation and prosecution of Cody Marble.

***Subsequent Failed Investigations***

18

57.     Defendants failed to conduct further investigations even though there was substantial evidence during the initial investigation that Marble never committed a crime against Thomas. The investigation against Marble was focused on conflicting witness statements and inconceivable eyewitness accounts.

58.     From the outset, the Defendants would have discovered that Chief Juvenile Detention Officer Scott Newman did not believe there was an adequate window of opportunity between Pod checks for Marble to have committed any crime against Thomas as alleged.

59.     The Defendants would have discovered that Juvenile Detention Officer Tracy Latimer had a feeling that something "weird" was going on that night.  She would have informed the Defendants that a co-worker at the MCDC, now deceased, told her that Marble was being setup. She never believed Marble was guilty.   Juvenile Detention Officer Latimer no longer works at the MCDC and remains convinced that Marble was railroaded.

60.     Furthermore, Defendants would have discovered that Juvenile Detention Officer Gary Lancaster had heard juvenile detainees discuss setting up other juveniles for wrongdoings they did not commit.  Furthermore, he would have told the Defendants that Kruse,

19

the one who initiated the original fabricated complaint against Marble, was lying about being an eyewitness to the fabricated crime.

61.     The Defendants would have also discovered that Juvenile Detention Officer Joanie Bigelow heard Van Mueller tell two (2) other juvenile detainees, including juvenile detainee Corrina Marry, that the sex crime never happened while being transported together in a van.

62.     The Defendants would have also discovered that Juvenile Detention Officer Gary Lancaster told Juvenile Detention Officer Dee Jackson that Melton-Roberts told him that he and the other juvenile detainees made up the rape allegation in order to frame Marble.

63.     The Defendants would have also discovered that Juvenile Detention Officer Tracy Addyman believed Melton-Roberts framed Marble.

64.     But, unfortunately, none of those crucial interviews were conducted during the alleged rape investigation focused against Marble from the outset.

65.     Moreover, Juvenile Detention Officers Bigelow and Latimer, while doing their random Pod checks during the evening of March 10, 2002, never smelled the odor of sex or feces, the latter of which Miller lied about seeing and smelling on Marble.

*Cody Marble is Arrested and Charged Based on Fabricated Evidence*

66.     As previously alleged herein, Marble was arrested on March 17, 2002, without probable cause or an arrest warrant based on the fabricated evidence gathered as of that date from the juvenile delinquent detainees.

67.     The Defendants clearly ignored the non-fabricated evidence, which overwhelmingly established Marble's innocence.

68.     The alleged eyewitness accounts and subsequent exchanges with Thomas by the juvenile detainees were blatantly contradictory. In other words, the alleged rape could not have occurred at the time alleged according to the four (4) highly-trained Adult Juvenile Detention Officers, the C Pod videotape, the position of the juvenile detainees on the evening of March 10, 2002, the vanity in the shower area being non-transparent, and et cetera.

69.     The Defendants consciously decided to disregard Marble's unalienable right to life, liberty, and pursuit of happiness by charging him with sexual intercourse of Robert Thomas without consent, a

felony, and convincing the jury that Marble was guilty for a heinous felony sex crime against a male inmate that never occurred.

### Cody Marble was Wrongfully Convicted

70.     On November 22, 2002, a jury found Marble guilty of sexual intercourse without consent, a felony.

71.     Marble was sentenced to 20 years in prison, with 15 years suspended.

72.     Marble maintained his innocence from the first moment he was accused by the onslaught of lies against him. He never did anything the purported eyewitnesses alleged he did, and there is abundant evidence that the juvenile detainees unequivocally made up the whole thing just to get Marble convicted of a crime with the hopes of bettering their legal statuses while at the MCDC. The juvenile detainees did to Marble what they tried to do to a previous juvenile detainee, William Goodbird, who had been previously released before Marble.

73.     Missoula County Deputy Attorneys Andrew Paul and Brownlow secreted Kruse away from Marble's defense counsel by amending his homicide charge for the death of a homeless man to a misdemeanor

22

and releasing him in order to keep him away from the court and jury so he would not keep repeating his September 10, 2002, recantation.

74.     Moreover, during Marble's trial, Missoula County Deputy Attorney Brownlow assumed the highly unusual role of a witness and testified to the court and jury that on September 10, 2002, Kruse told her that he did not see Marble rape Thomas. Brownlow further testified that Kruse stated to her that he just heard about it immediately after it allegedly happened, and that he subsequently told law enforcement (Juvenile Detention Officer Addyman) that he heard about Marble raping Thomas several days later.

75.     Most notably, Missoula County Deputy Attorney Brownlow was evasive and antagonistic when cross-examined about the meaning of the word "recant" while on the witness stand.

76.     Notwithstanding this subsequent admission by Kruse who first reported witnessing the alleged rape of Thomas that he never saw anything, Missoula County Deputy Attorney Brownlow persisted in the criminal prosecution against Marble.

77.     Kruse told Deputy Giffin during an interview on March 16, 2002, six (6) days after the alleged rape, that he actually saw Marble having anal sex with Thomas, an obvious lie that the prosecutors assigned to

23

Marble's case should have detected right away. Furthermore, the prosecutors should have reconsidered their prosecution of Marble in light of the abundance of blatant lies being told to various Missoula County law enforcement personnel, and Missoula County employees and officials, especially, when Kruse, who initiated the fabricated rape story against Marble, recanted to Missoula County Deputy Attorney Brownlow on September 10, 2002.

78.     Notwithstanding the fact that Missoula County Deputy Attorneys Paul and Brownlow also ignored the fact that the C Pod video footage of the evening of March 10, 2002, revealed no evidence of any crime committed by Marble, Missoula County Deputy Attorneys Paul and Brownlow added insult to injury during Marble's jury trial by blatantly discrediting Juvenile Detention Officer Joanie Bigelow's testimonial evidence that she overheard Van Mueller tell two (2) other juvenile detainees that the rape never happened. Missoula County Deputy Attorney Brownlow expressed her disbelief and deliberately chose to continue to wrongfully prosecute and convict Marble for a heinous felony crime that never happened by not presenting the exculpatory written reports of the four (4) highly-trained Adult Juvenile Detention Officers and otherwise discrediting them before the court and jury.

24

79.     During the pre-trial stage of Marble's case, Missoula County Deputy Attorney Brownlow told Juvenile Detention Officer Joanie Bigelow that she did not need to interview any Juvenile Detention Officer because she already had conclusive physical evidence that Marble raped Thomas and disregarded the four (4) highly-trained Adult Juvenile Detention Officers' account of the night in question because in Missoula County Deputy Attorney Brownlow's mind, Marble was guilty no matter what.

80.     Specifically, Missoula County Deputy Attorney Brownlow represented to Juvenile Detention Officer Joanie Bigelow that her physical proof was a forensic examination of Thomas by Dr. Eric Kress, which, in fact, was negative of a sexual assault.

81.     Knowing that the case against Marble was a house of cards, Missoula County Deputy Attorneys Paul and Brownlow systematically suppressed or lied about and/or discredited evidence favorable to Marble immediately before and during the jury trial with the objective to "railroad" Marble into state prison.

82.     Missoula County Deputy Attorney Brownlow dealt with Marble on several prior occasions in Youth Court for misdemeanors and had a personal dislike of Marble so much that when the fabricated sex

25

crime was alleged against him, she developed tunnel vision and took it as her chance to convict Marble once and for all when Marble refused to plead guilty to her plea offer of a three (3) year deferred sentence if he would plea guilty to sexual intercourse without consent, a heinous felony crime, with no further jail time.

83.    In Missoula County Deputy Attorney Paul's closing argument, he urged the jury to disregard any statements by the highly-trained Juvenile Detention Officers and to not believe them because they could not admit that such a crime could take place on their watch and because it makes them feel better about themselves (direct argument from Missoula County Deputy Attorney Paul to the jury during closing).

84.    Missoula County Deputy Attorney Paul had it out for Marble so much during his closing argument, he turned his hypothetical question, earlier in the trial, of sexual assault anus healing addressed to Dr. Kress, the medical doctor who conducted a medical exam of Thomas, into fabricated evidence that Marble did commit the sex crime because Thomas' anus quickly healed.

85.    Missoula County Deputy Attorneys Paul's and Brownlow's biases and ineptness in handling Marble's case with the care it

needed is underscored by a subsequent investigation by the United States Department of Justice, which concluded that the Missoula County Attorney's Office (during Van Valkenburg's tenure) often failed to take the steps necessary to develop sexual assault cases, citing former Missoula County Attorney Fred Van Valkenburg's custom of not providing Missoula County Deputy Attorneys with the basic knowledge and training respecting sexual assaults necessary to effectively and impartially investigate and prosecute those cases.

86.     The United States Department of Justice also concluded, amongst various other conclusions, that the Missoula County Attorney's Office (during Van Valkenburg's tenure) routinely failed to engage in the most basic communication about its cases of sexual assault with other law enforcement and other partners; not until being investigated did the office start to provide its deputies with the basic knowledge and training about sexual assault necessary to effectively and impartially investigate and prosecute sexual assault cases. The training remains insufficient and incomplete; and that an institutionalized indifference to crimes of sexual violence...handicaps the office's ability to protect victims of crime effectively or handle sexual assault cases fairly.

27

87.     At the very least, as supervisory prosecutor over Missoula County Deputy Attorney's Paul and Brownlow, former Missoula County Attorney Van Valkenburg should have made reasonable efforts to ensure that his juniors conformed to the ethics required of them as prosecutors and to protect the rights of the accused, but they did not.

88.     Lest we forget, back on July 3, 2001, Robert Lindell Stone was arrested at the Poverello Center in Missoula, Montana, after witnesses identified him from a photograph as the man named "Tennessee" they were looking for in connection with Robert Vourakis' death. He was held in at MCDC on $250,000.00 bail since his arrest. Three other people, David Ross Groger, Scott Kruse (Marble's original accuser), and Corrina May were also in custody in Missoula in connection with this murder.

89.     It was not until around March 2002 that former Missoula County Attorney Van Valkenburg figured out that Stone was the wrong person and released him from jail. "We basically told him we're sorry and that we know it was a difficult time for him. There was initially a basis to arrest him. But we concluded there was no longer a reason

28

to prosecute him," stated former Missoula County Attorney Van Valkenburg.

90.     Missoula County Attorney Van Valkenburg kept the same wrongful prosecution pattern going on during the same month and year with out skipping a beat by continuing with his malicious prosecution against Marble.

91.     For years Marble languished in a prison cell, not knowing whether he would spend the rest of his life wrongfully convicted for a heinous felony sex crime against a fellow inmate that never happened.

92.     Furthermore, the nature of Marble's wrongful conviction, alone, put Marble's life in peril amongst the prison population as he was necessarily subjected to ridicule and harassment, as well as possible sexual assault, thus rendering his time in prison so much more difficult to endure.

### Cody Marble's Conviction Unravels After Years of Incarceration

93.     In 2009, while out of prison and on parole, Marble wrote to the Montana Innocence Project requesting help because he had heard rumors that Thomas, who had been imprisoned after being convicted

29

of raping someone, was telling other inmates that Marble was innocent and that no rape had occurred in the MCDC.

94.     Between 2009 and 2010, Larry Mansch, attorney for the Montana Innocence Project, and Jesse McQuillan, the former director of the Montana Innocence Project, conducted several interviews with Thomas. In every interview, Thomas verbally recanted his testimony implicating Marble as his sexual assailant.

95.     In July 2010, Thomas wrote a recantation that said other youths in the detention center forced him to falsely accuse Marble of the rape. Thomas asserted that having been convicted of a sex crime himself, he understood the gravity of his false accusation.

96.     Specifically, Thomas wrote, "I want to come out and let it be know[n]. I'm coming forward now because I'm in prison on a sex crime and know what it is like. So I don't want him [Marble] to be charged with one when innocent. When I was in (the detention center), I was [sic] youngest & smallest and I was pressured into going along with it." Thomas later signed a more detailed recantation prepared by Mansch.

97.     Additionally, during a re-investigation, Corrina Marry recanted her testimony by admitting she lied at Marble's trial.

30

98.   Specifically, Marry executed an affidavit, stating her trial testimony was false and that Van Mueller had been adamant that the crime never happened. Marry stands by her affidavit recanting her trial testimony.

99.   Sometime later in 2010, after an in-depth and thorough investigation of the facts and history of Marble's legal ordeal, the Montana Innocence Project accepted Marble's case.

100.   The Montana Innocence Project's Petition for Post-Conviction Relief pointed out that Scott Kruse, the original accuser, did not testify at Marble's trial and recanted his statement that he saw Marble rape Thomas. Importantly, Kruse was on lockdown and in his cell at MCDC during the time he first stated that the rape occurred, therefore making it impossible for him to have even seen anything in C Pod.

101.   Disappointingly, the Defendants did not notice or refused to recognize this obvious impossibility from the outset.

102.   Moreover, the Montana Innocence Project interviewed Thomas on July 20, 2010, and during the interview, Thomas admitted that other juvenile inmates bullied him into setting up Marble and gave as the reason for the setup was the expectation of all those involved with

31

the setup to receive lighter sentences in exchange for reporting a fabricated crime against Marble.

103.      More importantly, Thomas admitted Marble never raped him and that he lied at trial. Had it not been for the Montana Innocence Project's investigation, Marble would have been damned for the rest of his life carrying a heinous felony sex crime conviction for a crime that he never committed.

104.      On January 26, 2012, former Missoula County Attorney Van Valkenburg perpetuated the prosecution's malicious prosecution against Marble during an interview with Thomas by beginning Thomas' interview by threatening him with prosecution for perjury during Marble's jury trial if he lies to him, which then caused Thomas, immediately thereafter, to refrain from repeating his recantation of telling the truth of Marble never raping him.

105.      Consequently,   former   Missoula   County   Attorney   Van Valkenburg's threat caused Thomas to recant his recantation.

106.      In October 2012, Thomas testified at a hearing on Marble's post-conviction petition that he had been raped and that his recantation was false. As a result, in November 2013, Judge Harkin denied Marble's petition.

32

107.    Notably, former Missoula County Attorney Van Valklenburg did not charge Thomas with perjury for asserting he previously falsely recanted since he re-established the malicious prosecution narrative against Marble.

108.    In April 2014, while Judge Harkin's ruling was being appealed, Thomas, who had been released from prison on parole, committed suicide during a standoff with law enforcement in Havre, Montana.

109.    Then, in August 2015, the Montana Supreme Court reversed Judge Harkin's ruling and sent the case back to Missoula County District Court. The Montana Supreme Court ruled that Judge Harkin had applied the wrong legal standard in denying Marble's post-conviction petition and that a broader standard should be applied.

***Missoula County Attorney Pabst's Motion to Dismiss Cody Marble's Case is Granted***

110.    Some 8 months later in April 2016, Missoula County Attorney Pabst filed a motion to dismiss Marble's case during Marble's Montana Innocence Project's post-conviction petition proceedings, stating, "The conviction lacked integrity and in the interests of doing justice, it must be dismissed, and that it was never too late to do the

33

right thing." Retired Judge Edward P. McLean presided over the proceedings and did not grant Missoula County Attorney Pabst's motion right away. However, Judge McLean did release Marble from custody on April 21, 2016, pending further court proceedings.

111.    He also granted former Missoula County Attorney Van Valkenburg's request to weigh in on the matter in a non-prosecutorial role as *amicus curiae*. Former Missoula County Attorney Van Valkenburg injected himself in his individual capacity to hopefully finish what he and his former prosecution team started against Marble back in March of 2002. He continued asserting that Marble committed the offense for which he was convicted and requested the Court to deny Marble's post-conviction petition.

112.    Moreover, in Missoula County Attorney Pabst's motion, she noted that Thomas had recanted to the Montana Innocence Project and that although Thomas later recanted the recantation, he only did so because former Missoula County Attorney Van Valkenburg told him during his January 2012 deposition that if he strayed from his original testimony he would prosecute him for perjury.

113.    Specifically, former Missoula County Attorney Van Valkenburg stated to Thomas, "And I would advise you that if in fact I am able to

34

establish sufficient evidence outside of what you say in this deposition, that you lied during that trial on the substance of the issue, and that is whether or not Cody Marble raped you, that I will in fact prosecute you for perjury for your actions in lying at that trial."

114. And, as mentioned-above, Thomas had already perjured himself, but was not prosecuted by former Missoula County Attorney Van Valkenburg as a reward for sticking to the fabricated story about Marble sexually assaulting Thomas. Recall that on December 12, 2016, former Missoula County Attorney Van Valkenburg testified, in his personal capacity, before Judge McLean that he interviewed Thomas at the Sanction Treatment Assessment Revocation and Transition Center a few days prior to the October 2012 hearing because he wanted to know if Thomas was going to say anything different from his January 2012 deposition. Former Missoula County Attorney Van Valkenburg conducted this interview alone and without notifying opposing counsel of his one-on-one interview with Thomas, which was conveniently not recorded.

115. During this illicit interview, Thomas requested information from former Missoula County Attorney Van Valkenburg. And shortly after the October 2012 Post-Conviction hearing before Judge Harkins,

35

former Missoula County Attorney Van Valkenburg suspiciously provided the requested information to Thomas as an apparent reward for sticking to the fabricated narrative against Marble. Van Valkenburg had also sent a letter to the Montana Parole Board urging it uphold Marble's conviction.

116. During the early part of May 2016, Missoula County Attorney Pabst filed another motion asking Judge McLean to make an immediate ruling on the dismissal without former Missoula County Attorney Van Valkenburg's input, which Judge McLean denied.

117. Then on May 24, 2016, and flying in the face of the interests of justice, former Missoula County Attorney Van Valkenburg stated, in his brief, "Judge McLean lacked the jurisdiction and has no authority to grant current Missoula County Attorney Pabst's motion to dismiss the case against Cody Marble." He further stated, "The court could not make a ruling on the motion to dismiss the case because it was remanded with very specific instructions from the Montana Supreme Court on what the judge should be deciding. The Supreme Court has previously said that when it remands a case with specific directions to the district court, the lower court is limited in its jurisdiction and

36

authority in the case to carrying out the Supreme Court's specific directions on remand."

118.    Missoula County Attorney Pabst's motion requesting the dismissal of the case included part of a deposition between former Missoula County Attorney Van Valkenburg and Marble's accuser, Thomas, after Thomas recanted the story of his rape. She also wrote, "Thomas had been given limited immunity during the deposition, and while statements he made during the hearing could not be used against him, he could be charged with perjury for recanting his story, which was threateningly asserted. Since the trial, two (2) other unnamed witnesses had recanted."

119.    She further wrote, "That because of Van Valkenburg's threats during the interview when he was the Missoula County Attorney, Thomas recanted his recantation, and reverted to the story that he had been raped by Marble. Missoula County Attorney Pabst characterized then Missoula County Attorney Van Valkenburg's interrogation with Thomas as threatening."

120.    Furthermore, in Missoula County Attorney Pabst's motion for Judge McLean to rule immediately, she wrote, "Failing to grant the dismissal violated the separation of powers under both the federal

and state constitutions." Former Missoula County Attorney Van Valkenburg responded, "Nothing could be further from the truth."

121. Former Missoula County Attorney Van Valkenburg concluded his *amicus curiae* brief by asserting that Judge McLean should both deny Missoula County Attorney Pabst's motion to dismiss and find that Marble has not met the standard for new evidence, which the case initially had been remanded to the district court to consider.

122. Then, on May 25, 2016, Missoula County Attorney Pabst responded to former Missoula County Attorney Van Valkenburg's filing, saying that, "As the elected county attorney, she is called upon to make difficult decisions on a daily basis. One of the hardest things for lawyers to do is to admit when we've made a mistake. No human system is perfect but, if we are truly committed to improving the criminal justice process, we must admit when we are wrong and commit to making sure that doesn't happen again... After conducting an exhaustive investigation and carefully examining all of the facts and evidence in this [Marble's] case, in light of my ethical obligation to do justice, I firmly stand by my decision that the charges against Cody Marble must be dropped. It may not be popular, but it's the right thing to do."

38

123.    During the continuation of the Petition for Post-Conviction Relief

hearing on December 12, 2016, former Missoula County Attorney

Van Valkenburg argued and testified that he still believed Marble was

guilty.

124.    Moreover, former Missoula County Attorney Van Valkenburg

opposed the stipulation between Marble and Missoula County

Attorney Pabst, which was to grant Marble's request for relief for a

new trial in light of the subsequent developments.

125.    Furthermore, former Missoula County Attorney Van Valkenburg

disparaged Missoula County Attorney Pabst asserting that her current

position with Marble's criminal case was inconsistent with her current

policy for her office. While continuing to disparage her, he

conveniently omitted any reference to the fact that she was

approaching Marble's post-conviction petition with a Section 46-21-

102(2), MCA, analysis and not with any other analytical approach he

was using.

126.    Former Missoula County Attorney Van Valkenburg ultimately

asked Judge McLean…"to reject the stipulation between Missoula

County Attorney Pabst and Marble, issue an order essentially saying

that the court finds that the evidence, as a whole, which includes the

39

recantation, does not establish that Marble did not commit the offense for which he was convicted, and deny the Petition for Post-Conviction Relief."

127.    At the conclusion of the December 12, 2016, hearing, Missoula County Deputy Attorney Matthew C. Jennings summed up Missoula County Attorney Pabst's position quite well when he stated, "The County Attorney's Office has conceded and stipulated that a new trial under these factual circumstances, and with the new legal standard provided by the Supreme Court, is appropriate in this circumstance. If Mr. Thomas was still alive, if some of the other witnesses were still alive or could be found, perhaps our office would be viewing whether a new trial was actually appropriate, whether we could find more evidence, take this back before a jury again. But time, death, recantations have made that impossible. Because of that, the County Attorney's Office has made the difficult and perhaps controversial decision that we were not opposing the Petition for Post-Conviction Relief…The evidence presentable today and through the Court file from up to 14 years back demonstrates the underlying conviction does lack integrity, and we respectfully request a ruling from the Court."

40

128.    Finally, on January 3, 2017, Judge McLean vacated Marble's conviction and ordered a new trial for the alleged rape of Thomas. In his vacate order, Judge McLean wrote that, "Testimony given during a December hearing undermined his confidence in the conviction against Cody Marble, who was 17 when he was charged with raping a 13-year-old boy."

129.    Following Judge McLean's vacate order, Missoula County Attorney Pabst immediately filed a motion to dismiss the case again, and on January 6, 2017 Judge McLean issued his Order of Dismissal.

130.    Because of this travesty of justice, Cody Marble contends that the Defendants systematically fabricated the evidence necessary for probable cause, which in turn was used to falsely arrest, prosecute, convict and incarcerate him.

131.    Furthermore, that instead of moving to remedy the effects of his false arrest and wrongful conviction against him prior to the filing of this Complaint, all of Defendants conspired to obscure the truth so as to insulate themselves from any possible civil action.

## Damages

132.    As a result of the Defendants' unconstitutional conduct against Cody Marble, he spent countless days incarcerated for a crime he did

41

not commit; and more importantly, for a heinous sex crime that never happened. Defendants violated Marble's constitutional right and stole a good portion of his life.

133.     Marble spent thirteen (13) years in prison for a sex crime he did not commit. During his incarceration, many of his friends graduated from college, embarked on new careers, got married, had children, and became contributing members of their respective communities. Rather than sharing in these experiences and living a life of his own, Cody Marble languished in a prison cell not knowing if he would have to spend the rest of his life convicted of a heinous felony sex crime that never occurred.

134.     As a result of the foregoing, Cody Marble suffered tremendous damages, including physical sickness, injury, and emotional damage, all proximately caused by Defendants' misconduct. Cody Marble sustained injuries and damages including: loss of freedom for thirteen (13) years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development;

42

and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic and recreational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which Marble is entitled to monetary relief.

135.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Cody Marble sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care, for which he is entitled to monetary relief.

136.    These injuries and damages to Cody Marble were foreseeable to Defendants at the time of their acts and omissions.

137.    All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages (where applicable).

43

**CLAIMS**

*Count I*     *False Arrest: 42 U.S.C. § 1983*

**(Against Defendants in their individual capacities)**

138.     Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

139.     Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor and John Does 1-5 are "persons," as that term is used in the text of 42 U.S.C. § 1983.

140.     Under color of state law, Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor and John Does 1-5 acting individually and in concert with each other, did willfully and unlawfully, under color of legal authority, illegally arrested and/or caused the illegal arrest of Plaintiff and detained him against his will without probable cause and due and legal process.

141.     Their conduct violated Plaintiff's clearly established rights under the 4th Amendment of the United States Constitution.

142.     As a direct and foreseeable consequence of these deprivations caused by the Defendants in this count, Plaintiff suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy,

44

loss of business opportunity, loss of educational opportunity, and irreparable harm to his reputation.

143.     As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent him throughout his legal saga pursued against him and incurred expenses associated with defending against the unlawful proceedings initiated and maintained by Defendants in this count.

144.     The Defendants' unconstitutional action was the cause-in-fact of Plaintiff's injuries.

145.     Marble suffered grievous injuries and damages in an amount to be determined at trial.

### Count II     Malicious Prosecution: 42 U.S.C. § 1983
### (Against Defendants in their individual capacities)

146.     Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

147.     Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 are "persons," as that term is used in the text of 42 U.S.C. § 1983.

148.     Under color of state law, Defendants Michael McMeekin, Brad

45

Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 commenced or caused to be commenced a criminal prosecution, instituted with malice, against Plaintiff. They used improper and inadequate investigative techniques, and they wrongfully relied upon, fostered, pressured and/or incentivized juvenile detainee witnesses and lacked probable cause.

149.    The Defendants acted to secure a conviction of Plaintiff regardless of the exculpatory and incredible evidence and without investigating leads that pointed to Plaintiff's innocence. They chose to ignore, withhold, and/or misrepresent the evidence that indicated Plaintiff's innocence.

150.    Only through exploitation of the unlawful acts and omissions of the Defendants in this count was the prosecution able to obtain a guilty verdict against Plaintiff, an innocent man.

151.    The matter ultimately terminated in Plaintiff's favor on January 6, 2017, when his conviction was vacated and the sex crime case against him was dismissed, on the grounds of actual innocence.

152.    The conduct of the Defendants in this count violated Plaintiff's clearly established rights under the 4th and 14th Amendments of the

46

United States Constitution.

153.    As a direct and foreseeable consequence of these deprivations caused by the Defendants in this count, Plaintiff suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of business opportunity, loss of educational opportunity, and irreparable harm to his reputation.

154.    As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent him throughout his legal saga pursued against him and incurred expenses associated with defending against the unlawful proceedings initiated and maintained by Defendants in this count.

155.    The Defendants' unconstitutional action was the proximate and cause-in-fact of Plaintiff's injuries.

156.    Marble suffered grievous injuries and damages in an amount to be determined at trial.

### Count III    Wrongful Conviction/Incarceration: 42 U.S.C. § 1983

### (Against Defendants in their individual capacities)

157.    Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

158.    Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder,

47

Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 are "persons," as that term is used in the text of 42 U.S.C. § 1983.

159.     Under color of state law, Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 acting individually and in concert deprived Plaintiff of his clearly established constitutional right, under the 14th Amendment of the United States Constitution, to a fair adjudication of his rights by failing to conduct an adequate investigation and by failing to rectify the wrong afflicted by the Defendants upon the Plaintiff.

160.     The Defendants' unconstitutional action was the proximate and cause-in-fact of Plaintiff's injuries.

161.     As a direct and foreseeable consequence of these deprivations, Plaintiff suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of business opportunity, loss of educational opportunity, and irreparable harm to his reputation.

162.     As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent him throughout his legal saga pursued against him, and incurred expenses associated with

48

defending against the unlawful proceedings initiated and sustained by Defendants in this count.

## Count IV   Reckless or Intentional Failure to Investigate - (14th Amendment - Substantive Due Process):42 U.S.C. § 1983
### (Against Defendants in their individual capacities)

163.    Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

164.    Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 are "persons," as that term is used in the text of 42 U.S.C. § 1983.

165.    Under color of state law, the acts or omissions of Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 were committed with deliberate disregard or indifference to Plaintiff's constitutional rights.

166.    Defendants' acts and/or omissions violated Plaintiff's right to substantive due process under the 14th Amendment of the United States Constitution.

167.    The Defendants' reckless or intentional failure to investigate

49

caused the continued criminal prosecution against Plaintiff despite his obvious innocence.

168.     The Defendants' unconstitutional action was the proximate and cause-in-fact of Plaintiff's injuries.

169.     As a direct and foreseeable consequence of these deprivations caused by the Defendants, Plaintiff suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of business opportunity, loss of educational opportunity, and irreparable harm to his reputation.

170.     As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent him throughout his legal saga pursued against him and incurred expenses associated with defending against the unlawful proceedings initiated and maintained by Defendants.

171.     Marble suffered grievous injuries and damages in an amount to be determined at trial.

*Count V     Destruction and/or Suppression of Exculpatory Evidence (14th Amendment - Procedural Due Process): 42 U.S.C. § 1983* **(Against Defendants in their individual capacities)**

172.     Marble hereby incorporates by reference all paragraphs of this

50

Second Amended Complaint as if fully set forth herein.

173.    Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 are "persons," as that term is used in the text of 42 U.S.C. § 1983.

174.    Under color of state law, the acts or omissions of Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 violated Plaintiff's right to procedural due process under the 14th Amendment of the United States Constitution and Plaintiff's right to a fair trial under the 6th Amendment of the United States Constitution.

175.    The Defendants' unconstitutional action was the proximate and cause-in-fact of Plaintiff's injuries.

176.    As a direct and foreseeable consequence of these violations committed by the Defendants in this count, Plaintiff suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of business opportunity, loss of educational opportunity and irreparable harm to his reputation.

177.    As a further consequence of these violations, Plaintiff was

51

required to retain counsel to represent him throughout his legal saga and incurred expenses associated with defending against the unlawful proceedings initiated and maintained by Defendants in this count.

178.    Marble suffered grievous injuries and damages in an amount to be determined at trial.

## Count VI   Fabrication of Evidence - (14th Amendment - Substantive Due Process): 42 U.S.C. § 1983

### (Against Defendants in their individual capacities)

179.    Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

180.    Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 are "persons," as that term is used in the text of 42 U.S.C. § 1983.

181.    Under color of state law, the acts or omissions of Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 were committed with deliberate indifference to Plaintiff's constitutional rights.

52

182.    The Defendants' acts or omissions violated Plaintiff's right to substantive due process under the 14th Amendment of the United States Constitution and Plaintiff's right to a fair trial under the 6th Amendment to the United States Constitution. Furthermore, their fabrication of evidence resulted in the wrongful and unwarranted continuation of criminal proceedings against Plaintiff.

183.    The Defendants' unconstitutional action was the proximate and cause-in-fact of Plaintiff's injuries.

184.    As a direct and foreseeable consequence of these violations caused by the Defendants in this count, Plaintiff suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of business opportunity, loss of educational opportunity and irreparable harm to his reputation.

185.    As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent him throughout his legal saga and incurred expenses associated with defending against the unlawful proceedings initiated and maintained by Defendants in this count.

186.    Marble suffered grievous injuries and damages in an amount to be determined at trial.

53

### Count VII   Failure to Intercede: 42 U.S.C. § 1983

### (Against Defendants in their individual capacities)

187.     Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

188.     Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 are "persons," as that term is used in the text of 42 U.S.C. § 1983.

189.     By their authority, conduct and public position of trust, and acting under the color of state law, Defendants Michael McMeekin, Brad Giffin, Jeremy Meeder, Michael Dominick, Robert Taylor, Fred Van Valkenburg, Jennifer Johnson, Dorothy Brownlow, Andrew Paul, and John Does 1-5 each had opportunities to intercede on behalf of Plaintiff to prevent his unlawful arrest, malicious prosecution, wrongful conviction, sentence, false imprisonment and deprivation of liberty without due process of law, but rather owing to their intentional conduct and/or reckless or deliberate indifference, each one of them failed or declined to do so, substantially adding to the damages suffered by the Plaintiff.

190.     Defendants' failures to intercede violated Plaintiff's clearly

54

established rights to be free from unlawful arrest, malicious prosecution, wrongful conviction, false imprisonment, and not to be deprived of liberty without due process of law as guaranteed by the 4th and 14th Amendments of the United States Constitution guarantying him due process of law before being deprived of his liberty and freedom from cruel and unusual punishment. No reasonable policy maker, agent, representative or public official acting within the scope of their authority would have believed that failing to intercede to prevent inadmissible, unreliable and exculpatory evidence to convict Plaintiff was lawful, just or appropriate.

191.    Furthermore, the actions of Defendants in this count deprived Plaintiff of his civil rights under the 5th and 8th Amendments of the United States Constitution. Each of the actions or omissions complained of in this Second Amended Complaint directly or indirectly caused the damages suffered by Plaintiff.

192.    The Defendants' unconstitutional action was the proximate and cause-in-fact of Plaintiff's injuries.

193.    As a direct and foreseeable consequence of these deprivations caused by the Defendants in this count, Plaintiff suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy,

loss of business opportunity, loss of educational opportunity and irreparable harm to his reputation.

194. As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent him throughout his legal saga and incurred expenses associated with defending against the unlawful proceedings initiated and maintained by Defendants in this count.

195. Marble suffered grievous injuries and damages in an amount to be determined at trial.

### Count VIII  Monell (14th Amendment - Procedural/Substantive Due Process): 42 U.S.C. § 1983

### (Against Missoula County)

196. Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

197. Defendant Van Valkenburg as former Missoula County Attorney had final policymaking authority for Missoula County, Montana, regarding the customs, rules, policies and practices that govern the investigators and prosecutors of the Missoula County Attorney's Office (during Van Valkenburg's time period).

198. Defendant Michael McMeekin as former Missoula County

Sheriff had final policymaking authority for Missoula County, Montana, regarding the customs, rules, policies and practices that govern the investigators and law enforcement procedures of the Missoula County Sheriff's Office.

199. Defendant Missoula County, by and through Van Valkenburg and Michael McMeekin, adopted policies, practices and/or customs which operated to deprive Plaintiff of his constitutional rights expressed in Counts I-VII.

200. Defendant Missoula County is accountable under 42 U.S.C. § 1983 because it intended to and did encourage, endorse, and/or reward its agents and employees for violating the constitutional rights of Plaintiff and other similarly situated persons.

201. The unconstitutional policies and practices include, but are not limited to:

    a. a policy, practice and custom of suppressing, destroying or otherwise secreting exculpatory evidence, including interviews with key witnesses providing potentially impeaching or exculpatory information, from the defense and limiting the defense access to such meaningful evidence;

    b. a policy, practice and custom of fabricating evidence, including

57

reports, witness statements and confessions;

c. a policy, practice, and custom of using interrogation techniques which had a great likelihood of obtaining false and unreliable information from suspects and witnesses;

d. a policy, practice and custom of intentionally failing to investigate potential leads that would uncover exculpatory evidence as to an accused and/or develop inculpatory evidence against those other than the accused;

e. a policy, practice and custom of using false, unreliable "jailhouse snitches" to bolster a case lacking in evidence;

f. a policy, practice and custom of failing to properly train and supervise officers and prosecuting attorneys' office investigators in the techniques and procedures of reliably investigating serious offenses and preserving exculpatory evidence;

g. a policy, practice and custom of failing to discipline officers who violate the Constitution and laws of the United States or otherwise transgress the rights of criminal suspects during their investigations; and

h. a policy, practice and custom of being deliberately indifferent to

58

the violation by law enforcement officers of the constitutional rights of the accused.

202.    These policies, practices and customs were adopted prior to the commencement of Defendants' investigation of Plaintiff and with deliberate indifference to Plaintiff's constitutional rights and the rights of those similarly situated.

203.    Defendant Missoula County is accountable under 42 U.S.C. § 1983 also because it, through Van Valkenburg and Michael McMeekin, was deliberately indifferent to an obvious need to train said Defendants to avoid constitutional violations arising from the utilization of improper and coercive interview techniques of witnesses and suspects, the failure to document and disclose interviews with key witnesses providing potentially exculpatory and impeachment evidence (*i.e.,* Brady violations) and the practice of deliberately ignoring leads and evidence that could lead to an individual's exoneration.

204.    Defendant Missoula County was on actual or constructive notice that there were omissions in its agent Defendants' training programs, causing it and their employees to violate citizens' constitutional rights due to the pattern of constitutional violations

arising from the utilization of improper and coercive interview techniques on witnesses and suspects, the failure to document and disclose interviews with witnesses disclosing potentially exculpatory and impeachment evidence (*i.e.*, Brady violations), and the practice of deliberately ignoring leads and evidence that could lead to an individual's exoneration.

205.    All of the Defendants disregarded the obvious need for training on these matters and continued to retain and adhere to the constitutionally deficient policies, practices and/or customs. This continued retention and adherence to constitutionally deficient policies, practices and/or customs despite an obvious need for training was carried out with a deliberate disregard and/or indifference to the rights of Plaintiff and those similarly situated.

206.    The acts or omissions of all the Defendants were the actual and proximate cause of Plaintiff's injuries as described herein. Defendant Missoula County deprived Plaintiff of multiple constitutional rights of the United States Constitution described in the preceding paragraphs herein.

207.    As a direct and foreseeable consequence of these deprivations, Plaintiff suffered economic loss, physical harm, emotional trauma,

loss of liberty, loss of privacy, loss of business opportunity, loss of educational opportunity and irreparable harm to his reputation.

208.    As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent him throughout his legal saga and incurred expenses associated with defending against the unlawful proceedings initiated and sustained by Missoula County.

209.    Marble suffered grievous injuries and damages in an amount to be determined at trial.

### Count IX   False Arrest-Montana Law

**(Against entity Defendants and the rest of the Defendants in their official capacity)**

210.    Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

211.    All of the Defendants, acting in concert with each other, did willfully and unlawfully under color of legal authority, arrested or caused the arrest of Plaintiff without a warrant or probable cause and detained him against his will without due and legal process.

212.    As a direct and foreseeable consequence of these deprivations caused by the Defendants in this count, Plaintiff suffered economic

loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of business opportunity, loss of educational opportunity and irreparable harm to his reputation.

213.    As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent him throughout his legal saga and incurred expenses associated with defending against the unlawful proceedings initiated and maintained by Defendants in this count.

214.    Marble suffered grievous injuries and damages in an amount to be determined at trial.

### Count X    Malicious Prosecution: Montana Law

### (Against entity Defendants and the rest of the Defendants in their official capacity)

215.    Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

216.    All of the Defendants commenced or caused to be commenced a criminal prosecution, instituted with malice, against Plaintiff. They used improper and inadequate investigative techniques, and they wrongfully relied upon, fostered, pressured and/or incentivized juvenile detainee witnesses and lacked probable cause.

217.    They acted to secure a conviction of Plaintiff regardless of the

exculpatory and incredible evidence and without investigating leads

that pointed to Plaintiff's innocence. They chose to ignore, withhold,

and/or misrepresent the evidence that indicated Plaintiff's innocence.

218.    Only through exploitation of the unlawful acts and omissions of

the Defendants in this count was the prosecution able to obtain a

guilty verdict against Plaintiff, an innocent man.

219.    The matter ultimately terminated in Plaintiff's favor on January

6, 2017, when his conviction was vacated and the sex crime case

against him was dismissed on the grounds of actual innocence.

220.    The conduct of the Defendants in this count violated Plaintiff's

clearly established rights under Sections 11, 15, and 17 of Article II of

the Montana Constitution.

221.    As a direct and foreseeable consequence of these deprivations

caused by the Defendants in this count, Plaintiff suffered economic

loss, physical harm, emotional trauma, loss of liberty, loss of privacy,

loss of business opportunity, loss of educational opportunity and

irreparable harm to his reputation.

222.    As a further consequence of these deprivations, Plaintiff was

required to retain counsel to represent him throughout his legal saga

63

and incurred expenses associated with defending against the unlawful proceedings initiated and maintained by Defendants in this count.

223.    Marble suffered grievous injuries and damages in an amount to be determined at trial.

### Count XI   Negligence

### (Against entity Defendants and the rest of the Defendants in their official capacity)

224.    Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

225.    At the time all of the Defendants were conducting the investigation into the purported juvenile detainee witnesses' claims, they each owed Plaintiff a duty to use due care with respect to their involvement in the investigation of the allegations, particularly insofar as their involvement required or otherwise threatened to promote the ongoing violation of Plaintiff's constitutional rights, privacy rights and rights to be free from grievous personal injury, among other things alleged in this action.

226.    At the time of the events alleged above, all of the Defendants owed Plaintiff a duty to use due care, especially in their investigation

64

of the purported eyewitnesses' false allegations.

227.    At the time that all of the Defendants made false and misleading witness statements to prop up the alleged juvenile detainee witnesses' credibility in the eyes of the public and, ultimately, a jury, each one of the Defendants' writings, acts or omissions otherwise constituting orchestration of the production of fabricated statements, knew or should have known that the purported juvenile detainee witnesses' statements constituted fabricated evidence  which destroyed their credibility and the Defendants' concealment of such exculpatory evidence was likely to cause Plaintiff harm.

228.    At the time the Defendants participated in the fabrication of witness statements, they knew or should have known that they were violating their policies, procedures, general orders, standard operating procedures, constitutional commands and that these multi-dimensional violations would perpetuate and facilitate the framing of the Plaintiff for a heinous felony sex crime these Defendant entities and their sworn officer Defendants knew did not happen and that their malfeasant or negligent actions would cause Plaintiff harm.

229.    Further, all Defendants had an affirmative duty to provide

65

Plaintiff with exculpatory evidence. This duty arises under *Brady v. Maryland*, 373 U.S. 83 (1963). Their duty of disclosure is also codified in Title 46, Chapter 15, Part 3, MCA, and is mandatory under *State v. Hatfield*, 269 Mont. 307, 312-13, 888 P.2d 899, 902-03 (1995).

230.    The Defendants breached their duty under Brady and Title 46, Chapter 15, Part 3, MCA, by converting exculpatory evidence into inculpatory evidence or explaining away exculpatory evidence with fabricated inculpatory evidence.

231.    In committing the foregoing negligent acts, all of the Defendants negligently breached their duties to use due care to avoid foreseeable harm to the Plaintiff, which were the cause-in-fact and proximate cause of Plaintiff's injuries and damages mentioned herein.

232.    As a direct and foreseeable consequence of these deprivations caused by the Defendants in this count, Plaintiff suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of business opportunity, loss of educational opportunity and irreparable harm to his reputation.

233.    As a further consequence of these deprivations, Plaintiff was required to retain counsel to represent him throughout his legal saga and incurred expenses associated with defending against the

unlawful proceedings initiated and maintained by Defendants in this count.

234.    Marble suffered grievous injuries and damages in an amount to be determined at trial.

### Count XII   Dorwart Claims: Violations of the Montana Constitution

### (Against entity Defendants and the rest of the Defendants in their official capacity)

235.    Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

236.    All of the Defendants are state entities or actors subject to the Montana Constitution.

237.    Cody Marble is a person protected by the Montana Constitution.

238.    Plaintiff's protections include, but are not limited to the right to due process, right to pursue life's basic necessities (and therefore, right to work); and the right to be free from unlawful arrest, malicious prosecution, wrongful conviction and false imprisonment.

239.    The foregoing acts, omissions, agreements, and concerted conduct of all the Defendants, acting in their official capacities, constituted willful abuses and perversions of the their entrusted

67

powers bestowed upon them by the State of Montana, which directly and foreseeably caused the deprivations/violations of the following rights guaranteed to the Plaintiff by Sections 3, 4, 11, 15 and 17 of Article II and Article X, of Section 1 of the Montana Constitution.

240.     As a direct and foreseeable consequence of these deprivations caused by the Defendants in this count, Plaintiff suffered the loss of education, loss of privacy, loss of liberty, physical harm, emotional trauma, irreparable reputational harm, and economic losses, including but not limited to the costs of retaining counsel, experts, investigators and other professionals reasonably necessary to aid in his defense throughout his pre-trial, trial, and post-trial legal saga.

241.     Marble suffered grievous injuries and damages in an amount to be determined at trial.

## Count XIII  Negligent Infliction of Emotional Distress

**(Against entity Defendants and the rest of the Defendants in their official capacity)**

242.     Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

243.     All of the Defendants acted individually and in concert to consciously railroad Plaintiff into being convicted for a heinous felony

sex crime he never committed, all while ignoring or being willfully blind to the overwhelming evidence that the juvenile detainee witnesses' statements were false and that Plaintiff was innocent of the alleged sex crime from the outset.

244.    Each of the Defendant's conduct subjected Plaintiff to public outrage and condemnation in his own community and the State of Montana.

245.    All of the Defendants were negligent in engaging in this conduct as it would have been reasonably foreseeable by them that Plaintiff would suffer emotional and psychological harm as a result of their conduct.

246.    All of Defendants' conduct herein were the cause-in-fact and proximate cause of Plaintiff's suffering, and he continues to suffer from diagnosable conditions causing disabling emotional, mental, and physical harm.

247.    Any normal person in Plaintiff's situation, having suffered a wrongful conviction and incarceration for a heinous felony sex crime, would have experienced severe emotional distress as Plaintiff has.

248.    Marble suffered grievous injuries and damages in an amount to be determined at trial.

69

### *Count XIV     Intentional Infliction of Emotional Distress*

### **(Against entity Defendants and the rest of the Defendants in their official capacity)**

249.     Marble hereby incorporates by reference all paragraphs of this Second Amended Complaint as if fully set forth herein.

250.     All of the Defendants, acting intentionally or recklessly, engaged in extreme and outrageous conduct - including without limitation the withholding and fabrication of evidence, intimidation/coercion of incentivized juvenile detainee witnesses, and failure to investigate with competence and impartiality - that resulted in Plaintiff's wrongful arrest, prosecution, conviction and imprisonment.

251.     All of Defendants' conduct herein were the cause-in-fact and proximate cause of Plaintiff's suffering, and he continues to suffer from diagnosable conditions causing disabling emotional, mental and physical harm as a result.

252.     A normal person in Plaintiff's situation, having suffered a wrongful conviction and incarceration for a heinous felony sex crime, would have experienced severe emotional distress, as Plaintiff has.

253.     Marble suffered grievous injuries and damages in an amount to be determined at trial.

70

**Prayer For Relief**

254.     Plaintiff respectfully prays that this Court will:

a.   Assume jurisdiction of this cause to determine this controversy and case for hearing on the merits in favor of Plaintiff;

b. Award compensatory and actual damages to Plaintiff, and against all applicable Defendants, jointly and severally, in an amount to be determined at trial;

c. Award punitive and exemplary damages to Plaintiff, and against all applicable Defendants, jointly and severally, in an amount to be determined at trial and in such a fashion that an award will deter similar proscribed conduct in the future;

d. Award to Plaintiff his costs and attorney's fees allowed under Montana law and 42 U.S.C. § 1988, pre-judgment interest, post-judgment interest, and all other damages allowed by law; and

e. Such other and further relief the Court deems just and proper.

DATED this 27th day of February, 2020

Respectfully submitted,

*Gale R. Gustafson*

Gale R. Gustafson

**Jury Demand**

Plaintiff demands trial by jury as to all issues so triable.

DATED this 27th day of February, 2020

Respectfully submitted,

*Gale R. Gustafson*

Gale R. Gustafson